*Decision will be entered under Rule 50.*

SEECK & KADE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32701. Filed August 8, 1957.

*Carter T. Louthan, Esq.*, for the petitioner.
*James A. Glascock, Jr., Esq.*, for the respondent.

TIETJENS, *Judge:* The petitioner contests the respondent's disallowance of relief pursuant to section 722 of the Internal Revenue Code of 1939 with respect to the petitioner's excess profits taxes for the calendar years 1942 to 1945, inclusive. At the hearing the petitioner amended its petition limiting its claim to the ground specified under section 722 (b) (2), namely, that its business was depressed during the base period because of temporary economic circumstances unusual in its case. Its excess profits tax returns for the calendar years

1942 to 1945, inclusive, were filed with the collector of internal revenue for the second district of New York.

The petitioner's excess profits tax liabilities as determined by the respondent are:

| | |
|---|---|
| 1942 | $14, 767. 76 |
| 1943 | 161, 767. 21 |
| 1944 | 111, 595. 02 |
| 1945 | 107, 033. 92 |

The petitioner claims overpayment of all these amounts.

The proceeding was heard before a commissioner of this Court.

### FINDINGS OF FACT.

The stipulated facts are so found and the stipulation and exhibits thereto are incorporated by this reference.

The petitioner is a corporation organized in June 1922 under the laws of the State of New York. Its principal office is in New York, New York. It keeps its books and files income tax returns on a calendar year basis. It filed applications for relief under section 722 for the years 1942, 1943, 1944, and 1945. In the years 1936 to 1939 the stockholders of the petitioner were: Max Kade, individually and as trustee for Annette Kade, Dr. Rudolf Herforth, and Hildegarde Herforth; the directors were Max Kade, Eugene Kade, Franz Loes, and Edith Crittenden; and the officers were Max Kade, president, Franz Loes, vice president and treasurer, Edith Crittenden, secretary in 1936–1938, and Madeline McGee, secretary in 1939.

In June 1922 the petitioner acquired the assets and goodwill of a business that had been carried on since 1913 by a sole proprietorship under the name of Seeck & Kade. This business was the manufacture and sale of Pertussin as a remedy for coughs associated with irritations of the throat and bronchial tubes. The only ingredient of Pertussin having medicinal value is thyme, the other ingredients being solvents and sugar. Prior to 1935 the petitioner sold for short periods some products made by others, but these sales were insignificant in quantity or earnings. Since 1935 Pertussin has been the sole product manufactured and sold by the petitioner.

About 1925 the petitioner organized a wholly owned subsidiary, Pertussin, Ltd., under the laws of Canada, which thereafter manufactured and sold Pertussin in Canada alone. Since then the petitioner has not sold this product in Canada. The subsidiary has never paid a dividend.

Prior to 1926 Pertussin was advertised only to the medical profession to be dispensed on prescription and was sold by the petitioner only to the wholesale drug trade. Beginning in 1926 the petitioner advertised to the public as well as to the medical profession.

During the colds seasons 1935–36 to 1939–40 the petitioner's expenses of advertising Pertussin to the medical profession and its total advertising expenses were:

| | To medical profession | Total advertising |
|---|---|---|
| 1935–36 | $37, 676 | $243, 984 |
| 1936–37 | 988 | 231, 939 |
| 1937–38 | 24, 634 | 201, 735 |
| 1938–39 | 2, 904 | 176, 299 |
| 1939–40 | 33, 557 | 190, 099 |

The advertising to the medical profession consisted of advertising in medical journals, mailing samples, and printing and distributing brochures describing the alleviating action of Pertussin or describing formulas for the relief of coughs in which Pertussin was used as a vehicle for other drugs. Total advertising expenses included trade journals, circulars, magazines, newspapers, posters, radio, samples to the public, and salesmen's salaries, travel expenses, and commissions.

The comparative balance sheets of the petitioner as of December 31 of each of the years 1936 to 1939 show the following items (among others):

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Accounts receivable | $17, 563. 16 | $14, 758. 23 | $24, 195. 76 | $20, 949. 64 |
| Inventory of merchandise | 55, 829. 21 | 48, 689. 65 | 58, 551. 08 | 49, 786. 09 |
| Patents, etc | 96, 500. 00 | 96, 500. 00 | 96, 500. 00 | 96, 500. 00 |
| Goodwill | 15, 000. 00 | 15, 000. 00 | 15, 000. 00 | 15, 000. 00 |
| Investments | 108, 270. 89 | 108, 270. 89 | 98, 413. 11 | 58, 065. 00 |
| Total assets | 464, 936. 94 | 483, 375. 42 | 456, 925. 27 | 441, 987. 68 |
| Capital stock | 125, 000. 00 | 125, 000. 00 | 125, 000. 00 | 125, 000. 00 |
| Profit for year | 109, 487. 86 | 183, 575. 00 | 124, 392. 65 | 142, 789. 08 |
| Dividends paid | (100, 000. 00) | (150, 000. 00) | (125, 000. 00) | (137, 500. 00) |

The petitioner's net sales and net income according to its tax returns and in accordance with reports of revenue agents where changes were made upon audit for the years 1923 to 1939, and the amount of its advertising expenses were:

| Year | Net sales | Net income per tax return | Advertising expense | Year | Net sales | Net income per tax return | Advertising expense |
|---|---|---|---|---|---|---|---|
| 1923 | $422, 822. 24 | $195, 904. 58 | $49, 955. 58 | 1932 | $541, 666. 70 | $105, 366. 65 | $241, 231. 81 |
| 1924 | 445, 906. 89 | 179, 832. 87 | 58, 435. 24 | 1933 | 467, 618. 30 | 97, 476. 97 | 208, 480. 72 |
| 1925 | 597, 356. 71 | 294, 001. 17 | 68, 255. 39 | 1934 | 489, 108. 10 | 77, 444. 74 | 226, 840. 86 |
| 1926 | 873, 318. 46 | 346, 548. 88 | 177, 845. 93 | 1935 | 504, 270. 12 | 75, 838. 29 | 223, 833. 57 |
| 1927 | 866, 365. 47 | 258, 836. 31 | 230, 776. 52 | 1936 | 576, 024. 25 | 109, 133. 89 | 239, 002. 10 |
| 1928 | 948, 745. 23 | 373, 235. 93 | 251, 658. 85 | 1937 | 620, 804. 65 | 185, 571. 11 | 205, 599. 48 |
| 1929 | 983, 850. 37 | 351, 120. 73 | 318, 495. 22 | 1938 | 489, 374. 11 | 122, 417. 95 | 159, 844. 67 |
| 1930 | 630, 731. 54 | 95, 371. 34 | 292, 275. 50 | 1939 | 502, 201. 76 | 142, 789. 08 | 151, 654. 39 |
| 1931 | 672, 982. 28 | 167, 060. 56 | 294, 737. 58 | | | | |

In 1932 and 1933 some retail druggists complained to the petitioner that competitors were selling Pertussin at ruinous prices and employees of the petitioner who were in touch with retailers reported instances more frequently in which Pertussin was used as a loss leader.

Prior to 1933 the petitioner offered free goods or premiums to retailers who bought in large quantities. In January 1934 the petitioner advertised in a pharmaceutical journal a protective price policy for the retailers of Pertussin, stating:

> We are in accord with the majority of retail druggists who believe that the trimming of profits through destructive price cutting is one of the greatest obstacles to recovery. We would prefer to have all retailers of Pertussin sell it at the full retail price printed on each carton or circular.
>
> Acting independently, we intend to oppose the sale of our merchandise below those prices which are essential to a fair profit to all who handle Pertussin.
>
> Although we cannot enter into any agreement with you which might be construed as an effort on our part to dictate prices, we do propose to exercise our legal rights immediately by refusing to sell to distributors who do not respect our suggested minimum resale prices.
>
> It is our conviction that the resale prices on Pertussin should be no lower than:
>   1. A minimum retail price of 49¢ on the 60¢ size.
>   2. A minimum retail price of $1.19 on the large $1.50 size.
>
> It is also our conviction that the bartering or sub-jobbing of our merchandise to other distributors is a harmful practice and that there is no necessity for any retailer to resort to such destructive measures.
>
> We ask your active support in adhering to the principles of this policy and pledge ourselves to do all we legally can to stabilize distribution for your greater benefit and profit.

This advertisement also stated:

> Pertussin advertising now reaches 27,000,000 drug-store customers in the United States * * * the largest national magazine campaign ever put behind a cough syrup.

Also in 1934 the petitioner announced abandonment of free goods deals.

In May 1935 the petitioner announced a new policy of placing Pertussin on consignment, stating:

> Our new policy of placing Pertussin on consignment with our wholesale distributors will limit the sale of Pertussin to retail pharmacists only. It is our aim that they obtain at least the suggested minimum prices: namely, 49¢ for the small and $1.19 for the large size of Pertussin.
>
> During the past two years we have taken three different steps to assure fair retail sales prices:
>   1. Announcement of Suggested Minimum Price Policy.
>   2. Elimination of Free Goods Deals.
>   3. Operation under Fair Trade State Laws where enacted.
>
> All these steps have not yet fully prevented the diversion of merchandise into channels which habitually use nationally advertised products for price baiting. The new plan is designed to stop this practice with Pertussin.

We believe that our policy of consigning Pertussin to selected wholesale distributors will succeed and enable retail pharmacists to make a profit from the sale of Pertussin.

Every retail pharmacist should buy Pertussin for his own store requirements only.

Under the consignment method of distribution the petitioner retained title to the Pertussin in the hands of the distributor and could control it until sold to the retailer. After adoption of this method of distribution the petitioner gave free goods deals to retailers during the years 1936 through 1939.

In 1935 the petitioner entered into contracts with some retailers to fix minimum resale prices pursuant to the so-called Fair Trade Law of New York. L. 1935, ch. 976. In November 1935 the petitioner sued one retailer alleging violation of such law by offering Pertussin for sale at 44 cents for the 4-ounce bottle when the minimum price fixed by contracts with other retailers was 49 cents, and asking for an injunction against the defendant. At that time the retailer buying Pertussin in dozen lots would pay about 38 cents for the 4-ounce bottle.

In August 1937 the Congress passed the Act known as the Miller-Tydings Act, 50 Stat. 673, amending section 1 of the Sherman Anti-trust Act. As amended, section 1 provided in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: * * *

. In 1937 the petitioner entered into retail sales contracts fixing minimum retail prices and in November 1937 notified its distributors of the cancellation of consignment contracts in view of the fact that it had established minimum retail prices in all States having fair trade laws. The minimum prices fixed in such contracts generally were 51 cents for the 4-ounce bottle and 89 cents for the 8-ounce bottle, which latter size was adopted in 1938 in lieu of the 11-ounce bottle previously used.

The adoption of the consignment method of distribution involved additional expenses. It was necessary to pay the distributors for the

additional work involved in keeping records, and costs were incurred in publishing notices of the changes. Additional employees were engaged to watch for price cutting and to stop distributions to price cutters. The adoption of fair trade contracts also involved extra expenses. Extra expenses were also incurred as a consequence of the change in 1938 to an 8-ounce bottle for the larger size of Pertussin.

During the years 1930 to 1939 the competitors of Pertussin included Cheracol, Creomulsion, Rem, Pinex, and Smith Bros. Cheracol is a cough syrup made by the Upjohn Co. It contains codeine and under the New York State narcotics law could be sold only on prescription or in quantities of not more than 4 ounces. In the years following 1930 sales of Cheracol were in excess of its 1930 sales while sales of Pertussin were less than its 1930 sales, except for 1931.

### OPINION.

The petitioner's argument is that its average base period net income is an inadequate standard of normal earnings because its business was depressed in the base period as a result of temporary economic circumstances unusual in its case, specifically, that it experienced a loss of goodwill in 1936 to 1939 due to the extensive use of its product, Pertussin, as a loss leader in 1932 to 1935, and that the loss of goodwill caused the sales and earnings to be depressed.

The actual average base period net income was $135,282.64. The average allowed pursuant to section 713 (e) (1) (increasing the income for the lowest base period year to 75 per cent of the average of the other years) was $136,541.14. The petitioner contends that a fair and just amount representing normal earnings would be $180,670 which is approximately the average earnings for the longer period 1923–1939, inclusive.

The petitioner points out that its average operating income for the years 1923–1935 was $195,062.44 and for the entire period 1923–1939 was $180,670.83, that the average for the base period was smaller than for any single prior year, except 1930 and the depression years 1932 to 1935, and that its earnings did not follow the pattern of earnings of corporations generally since its earnings were low in 1939 as well as in 1938.

Sales volume of the petitioner's product was high in the years 1926 through 1929 and continued to be fairly high in 1930 and 1931. Earnings from 1925 through 1929 were considerably higher than in any of the following years 1930 through 1939. The respondent argues that the base period average net sales of about $547,000 and average net income of about $134,000 were higher than the averages for the 12-year period 1930 to 1941 of $531,000 and $114,000, respectively, indicating that the petitioner's business was not depressed in the base period. The petitioner contends that the period selected by the re-

spondent is not fairly representative since it includes depression years 1932 through 1935.

We have held that business fluctuations are normal conditions and that a failure to maintain a given level of earnings does not establish that earnings are depressed within the meaning of section 722 (b) (2). *Harlan Bourbon & Wine Co.*, 14 T. C. 97, 104 (1950). Nor is such a depression of earnings proved by showing that the average base period net income was lower than similar averages for longer periods such as 1923–1935 or 1923–1939. *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, 1229 (1945) ; *Wadley Co.*, 17 T. C. 269, 277 (1951). The fact that earnings from 1930 through 1941 were less than in the years before and in the years after this period is not sufficient to prove that the base period earnings were abnormally low.

Furthermore, even if it is assumed that the average base period net income is an inadequate standard of normal earnings, the petitioner has not proved that this is a consequence of a temporary economic circumstance unusual in the case of the petitioner.

The petitioner's president defined a loss leader as a product sold or held out for sale at cost, or below cost, or at a price which will give an inadequate gross profit. The evidence that Pertussin was used as a loss leader to a greater extent than any other nationally advertised pharmaceutical item is scanty. The petitioner's president testified that letters were received from druggists complaining that Pertussin was being sold at ruinous prices by competitors and reports were received from petitioner's employees who were in contact with the retail trade describing with increasing frequency instances when it was used as a loss leader. Another witness, who conducted a retail pharmacy in Brooklyn and served on committees of the New York State Pharmaceutical Association, testified that Pertussin was used extensively as a loss leader in New York State from about 1931 to 1934. Respondent's witness, who operated several drugstores in the Bronx and Manhattan areas, testified that he operated cutrate stores and sold nationally advertised proprietary medicines, including Pertussin, at cutrate prices during the 1930's, doing business at a gross profit of 15 to 20 per cent, depending upon volume of business and quick turnover for successful operation. The management of the petitioner considered the difficulties resulting from price cutting or "loss leadering" sufficient to warrant resorting to the trouble and expense of selling to wholesalers on consignment only, by which method the petitioner could require its wholesalers to stop deliveries to retailers who failed to adhere to the retail prices recommended by the petitioner. This consignment method was commenced in about May 1935 and apparently had the effect of substantially reducing price cutting of Pertussin. After the enactment of the Miller-Tydings Act in 1937 the petitioner depended upon State fair trade contracts, and price cutting

of Pertussin was practically stopped. The petitioner abandoned the consignment method of distribution after 1937.

The effect of the use of Pertussin as a loss leader is difficult to measure. And the petitioner's representatives appear to regard loss leading and price cutting as the same thing. The petitioner's witnesses assumed that a retailer advertised a loss leader to entice customers into the store and then decried the merits of the advertised item and tried to sell in place of it something else on which a profit could be made. Thus the product was "talked down" and sold at a low price, which circumstances customers subsequently remembered and therefore they refused to buy at higher prices. This, it is said, resulted in a loss of goodwill which was not regained until after the base period. Respondent's witness, who sold at cut prices, said he would not waste time trying to talk a customer out of buying what he asked for and that at his prices he made a profit sufficient for his purposes.

Price cutting is neither temporary nor unusual, but is a factor of competition present in all business. If the petitioner's product was sold extensively at cut prices the quantity sold may have been greater than otherwise would have been the case. The petitioner did not reduce the wholesale prices and always received the full amount asked from the distributors. The petitioner's management considered it desirable to protect its retailers by resorting to the consignment method of distribution and by fixing prices under the fair trade laws. There is a divergence of opinion as to the merit or efficacy of such laws. Their application may have affected adversely, rather than favorably, the volume of the petitioner's subsequent sales. Some retailers may have preferred to stock a competitive product on which they were not subject to fixed prices. Any adverse consequences of the use of the consignment method of distribution and of fair trade contracts were the result of managerial decisions, not of unusual economic circumstances. See *Granite Construction Co.*, 19 T. C. 163 (1952).

We cannot conclude from the evidence in this proceeding that the failure of the petitioner's earnings in the base period to approximate the earnings in the years prior to 1930 was due primarily to a loss of goodwill resulting from sales at cut prices. The petitioner relies upon this and has the burden of proving it. But the record contains too many other possible reasons for this and does not justify a finding that loss of goodwill (if such occurred) resulted in depressed earnings.

The petitioner's president said that the increase in the volume of sales between 1936 and 1937 was a seasonal fluctuation, the drop in 1938 from 1937 was probably due to stock carried over by dealers, the small increase in 1939 over 1938 was a seasonal fluctuation, and that a fluctuation from one year to another amounting to 12 per cent

would be normal. He also testified that in 1938 and 1939 he assumed there was exceptionally good weather and there were fewer coughs. The general state of health of the public may have been good in these years and reduced the need for cough remedies.

The factor of advertising also has a bearing upon sales. The respondent argues that reduction in advertising reduces sales and increased advertising increases the volume of sales of a product such as Pertussin. In the later base period years the petitioner's expenditure for advertising was substantially reduced. The petitioner's president said that, because of the loss of goodwill, advertising could not be counted on to increase sales, since the retailers would not cooperate. But the reduction in advertising may just as well have been a causative factor rather than an effect.

There is also the factor of competition. One of the witnesses, who was a druggist, said he made a cough syrup under his own brand name. The extent to which local druggists might attempt to capture local trade with a competitive article cannot be measured. Other nationally advertised brands or new competing remedies may have become more popular from their effectiveness in giving relief or from the advertising techniques followed in promoting them and have displaced the petitioner's product in the market. These are economic circumstances, but they are, as are all effects of competition, regarded as normal and not unusual.

Having studied the record as a whole and giving regard to the many other possibilities which it raises, we are satisfied that the petitioner has not proved that its average base period earnings were an inadequate standard of normal earnings because of temporary economic circumstances unusual in its case. The respondent was not in error in disallowing the relief applied for.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*