THE EMPIRE CONSTRUCTION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52024. Filed January 26, 1959.

*Bernard Sherl, Esq.*, and *Lester Braunstein, Esq.*, for the petitioner.
*Martin D. Cohen, Esq.*, for the respondent.

860

OPINION.

RAUM, *Judge:* Petitioner contends that it is entitled to excess profits tax relief under section 722(b)(2), I.R.C. 1939. This section, insofar as here pertinent,[3] provides that the excess profits tax computed without the benefit of section 722 shall be considered to be excessive and discriminatory if the taxpayer's average base period net income is an inadequate standard of normal earnings because "[t]he business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer." The material part of the applicable regulations is set forth in the margin.[4]

Petitioner's argument may be summarized as follows:

During the years 1925 through 1935 the B & O was its principal customer and a chief source of its income was the expenditures of the B & O for additions and betterments. During the base period the B & O's volume of freight carried, volume of revenue received, miles of road operated, and net operating income (gross profit), were not below the general levels of comparable railroads, but its fixed interest on funded debt as a per cent of net railway operating income exceeded that of comparable railway groups. The net income of the B & O during the base period was abnormally low, considerably below that of comparable railway groups, because during the years 1937, 1938, and 1939 its fixed interest on funded debt and other fixed charges exceeded its net operating and other income, and resulted in net losses in those years. Because of this condition, which was temporary, the B & O's expenditures for additions and betterments during the base period were curtailed and dropped to an abnormally low level, below

---

[3] At the trial, petitioner's counsel expressly waived any claim based on temporary depression of petitioner's industry.

[4] SEC. 35.722–3, Regs. 112. DETERMINATION OF EXCESSIVE AND DISCRIMINATORY TAX; TAXPAYER ENTITLED TO EXCESS PROFITS CREDIT BASED ON INCOME.— * * *

* * * * * * *

Only those economic circumstances which were temporary in the sense that they had little perceptible effect upon the long run prospects of a business, and which affected the taxpayer alone or an industry of which it was a member as distinguished from those economic events which were of a chronic or continuing character or which affected business in general, may furnish a basis for a claim for relief under section 722(b)(2). An economic circumstance is temporary depending upon the character and nature of such circumstances rather than upon the mere length of time of its existence. Thus, the income of a declining business or industry which was depressed throughout the base period because of economic conditions of a chronic and continuing character which may be expected to depress the earnings of such business for an indefinite period is not an inadequate standard of normal earnings under section 722(b)(2). * * *

that of comparable railway groups. As a result of this reduction in expenditures, the volume of business petitioner received from the B & O during the base period was abnormally low. The receipt of such a low volume of business from the B & O was unusual in the experience of petitioner and caused its base period earnings to be depressed and an inadequate standard of normal earnings.

The evidence discloses that during the base period the business and earnings of the petitioner were depressed, and that this depression was caused in part by a decline in the volume of business received by the petitioner from the B & O. That railroad, prior to 1932, had been the principal customer of petitioner and the chief source of its income, but from and after 1932 it was merely one of the customers from which petitioner usually derived a substantial amount of income each year. The decline in the volume of business petitioner received from the B & O during the base period was due principally to the curtailment by that railroad of its expenditures for additions and betterments, which were the source of the business petitioner received from it, and to the fact that a substantial portion of the expenditures it made during that period were outside of the area in which petitioner operated. During the years 1925 through 1939 the B & O's ratio of such expenditures to net railway operating income, except for the years 1933 and 1939,[5] was always less than that of comparable railway groups. During the 1930's the gap between the lower expenditures of the B & O and the higher expenditures of comparable railway groups widened. A factor largely responsible for the lower expenditures of the B & O was its disproportionately high interest burden in relation to its net railway operating income, which exceeded that of comparable railway groups and left it with relatively less income available for expenditures for additions and betterments. During the base period years the B & O and other Class I railways in the United States were depressed because of permanent factors. During these years the expenditures of the B & O for additions and betterments were abnormally low and relatively lower than those of comparable railway groups. Its base period net income was also abnormally low and relatively lower than that of comparable railway groups. During the years 1937, 1938, and 1939 its fixed interest on funded debt and other fixed charges exceeded its net operating and other income, and resulted in net losses in those years. The year 1938 was the most disastrous year in its history. In 1939 it applied for and was granted relief under the Railroad Adjustment Act

---

[5] The relatively large expenditures for additions and betterments of the B & O in 1939 resulted in part from the provision in the 1939 plan of reorganization which permitted its board of directors to set aside, out of net income otherwise applicable to contingent interest, a capital fund for additions and betterments.

(Chandler Act). The purpose of this Act was to provide relief for railroads which were only temporarily financially embarrassed and whose general earning capacity had not been so seriously impaired as to require the more drastic reorganization and modification of its debt structure provided for in section 77 of the Bankruptcy Act. *In re Baltimore & O. R. Co.*, 29 F. Supp. 608.

While there does not appear to be an exact correlation between the amount of the B & O's expenditures for additions and betterments and its net railway operating income or net income, the years in which its net operating income was low and the years in which it had little or no net income were generally years in which its expenditures for additions and betterments were low. The depression years 1931, 1932, and 1933 were exceptions and the explanation of the comparatively large expenditures of the B & O in those years may perhaps rest on the fact that the B & O was merely carrying out commitments or plans formulated in prior prosperous years or possibly that the expenditures were made out of funds accumulated in such prior prosperous years from which needed expenditures could be made. We are convinced that the low expenditures of the B & O during the base period resulted in part from the permanent factors which adversely affected the income of all Class I railroads and in part from a temporary factor, namely, its disproportionately high debt and interest burden which impaired its ability to meet its fixed charges out of net operating and other income. We are satisfied that the latter was a temporary condition; that it caused the expenditures of the B & O to be abnormally low; and that it was responsible in substantial part for the low volume of business petitioner received from the B & O during the base period. It would therefore appear that petitioner qualifies under section 722(b) (2). Cf. *Southern California Edison Co.*, 19 T.C. 935; *Dyer Engineers, Inc.*, 10 T.C. 1265; and *Ainsworth Manufacturing Corporation*, 23 T.C. 372.

However, the matter does not end with mere qualification. In order to be entitled to relief under section 722(b) (2), it was incumbent upon petitioner to prove not only that it qualified for relief under that section but also to show a constructive average base period net income (CABPNI) which would produce credits in excess of those available to it under the invested capital method. The constructive increase in its actual average base period net income (ABPNI) required in order to attain a starting point for relief is shown in the following table:[6]

---

[6] In determining the constructive increase in ABPNI needed as a starting point for relief, the base upon which such constructive increase is added is the actual ABPNI (in this case, a loss of $29,364.26) rather than the ABPNI determined with the benefit of section 713(e) (in this case, $16,781.45), because section 722 relief is not superimposed over the relief automatically allowed under section 713 (e) or (f). Cf. *Stimson Mill Co.*, 7 T.C. 1065, affirmed 163 F. 2d 269 (C.A. 9), certiorari denied 332 U.S. 824; *Southern California Edison Co.*, 19 T.C. 935, 1001.

| Taxable year | Actual ABPNI | Invested capital credits allowed under sec. 714 | CABPNI necessary to provide equivalent excess profits credits | Constructive increase in ABPNI needed as a starting point for relief |
|---|---|---|---|---|
| 1942 | ($29,364.26) | $18,393.49 | $19,361.56 | $48,725.82 |
| 1943 | (29,364.26) | 27,653.66 | 29,109.11 | 58,473.37 |
| 1944 | (29,364.26) | 25,680.47 | 27,032.07 | 56,396.33 |
| 1945 | (29,364.26) | 25,977.86 | 27,345.11 | 56,709.37 |

Petitioner has submitted a proposed reconstruction of its base period earnings. The first step in this reconstruction is to raise the level of the base period expenditures of the B & O for additions and betterments to the same level as that of comparable railway groups. Using the ratios of expenditures for additions and betterments to net railway operating income of Eastern District Class I railways for the base period years, and multiplying them by the net railway operating income of the B & O for those years, petitioner arrives at the amount of $18,660,000 for normal expenditures of the B & O for the base period. It then assumes that its share of such expenditures would be 10 per cent, or $1,866,000, and that its profit on the excess of constructive work over actual work done for the B & O would be 22.82 per cent, or $276,000. The next step in the reconstruction is to adjust its actual base period loss of $117,457, by eliminating an alleged loss of $213,628 sustained on the Pennsylvania Turnpike contract in 1939, on the ground that it was unfamiliar with turnpike construction and that this loss would not have been sustained but for the temporary and unusual circumstance which caused the low volume of business received from the B & O. As the result of this adjustment petitioner reaches an adjusted base period net income of $96,171. By adding this amount to the constructive additional net income of $276,000, it arrives at a constructive aggregate base period net income of $372,171, and a constructive average base period net income of $93,043.

Petitioner's proposed reconstruction thus rests upon two principal adjustments: (1) Constructive additional net income in the amount of $276,000, and (2) the elimination of the alleged loss of $213,628 sustained on the Pennsylvania Turnpike contract. Respondent challenges both adjustments.

In arriving at total constructive additional net income of $276,000 petitioner assumed that it was entitled to raise the level of base period expenditures for additions and betterments of the B & O to the same level as that of Eastern District railroads, and that it would realize additional net income of 22.82 per cent of the amount of constructive additional work done for the B & O. However, the ratio of additions and betterments to net railway operating income of the Eastern District railroads in prebase period years was consistently higher than

that of the B & O.   And the evidence convinces us that the percentage of *net profit* or *net income* realized by petitioner on contracts performed for the B & O was substantially less than 22.82 per cent. Moreover, it is by no means clear from the evidence that petitioner would share in the hypothetical increase in contracts for additions and betterments to the extent that it assumes.   Taking the foregoing considerations into account we find that the constructive additional net income to which it might be entitled by reason of its B & O work would not be in excess of $160,000.

We next consider petitioner's contention that it is entitled to have a claimed loss of $213,628, sustained on the Pennsylvania Turnpike contract in 1939, eliminated in arriving at its CABPNI.   Unless this contention is sustained, it would not have a CABPNI large enough to produce relief.[7]

Petitioner argues that in 1939, because of its inability to obtain work "from its principal customer," the B & O, it was forced to bid on the Pennsylvania Turnpike job; that this job was in an area outside of its normal geographic area of operations; that it had to qualify to do business in Pennsylvania before the contract was awarded; that the specifications for the Pennsylvania Turnpike job as to embankments and excavations differed "radically and materially" from those on highway construction jobs previously performed by it and required the use of "completely different" equipment; that the provisions of the contract which compelled it to recruit its labor force from public relief rolls were basically different from its normal and usual labor policies and practices; and that all of these factors make up abnormal and unusual circumstances requiring the exclusion of the loss on the Pennsylvania Turnpike contract from a reconstruction of normal earnings.

As already noted, the B & O had not been the principal source of petitioner's income for some years prior to 1939.   True, during the period 1925 through 1931, 68.1 per cent of the work performed by petitioner was for the B & O.   But during the period 1932 through 1935 the percentage dropped to 25.3, and during the base period it declined to 22.39.   During the period 1932 through 1939 a very substantial portion of petitioner's annual income was derived from contracts with the Pennsylvania and other railroads, industrial customers, and public authorities.   Its policy, according to its president, was to keep its working forces on the payroll and keep its equipment busy,

---

[7] If the actual base period loss of $117,457 is subtracted from $160,000 (the maximum constructive additional income with respect to the B & O), the constructive net income for the entire base period would become $42,543, and the constructive average base period net income would be $10,636, which is less than the amount of the invested capital credits actually allowed under section 714 for each of the base period years.

and to bid on anything that came along in the construction field. In 1939, therefore, when it bid on the Turnpike job, it was not relying on one customer for its income. The prospect that it would not in that year receive business from the B & O, or some of its other large customers for that matter, may or may not have been a factor which prompted it to bid on the Turnpike contract. We are not convinced, however, that lack of business from the B & O, or any other large customer, was responsible for the loss sustained on that contract. Neither are we convinced that the loss can be attributed to the fact that the work was performed outside of petitioner's usual area of operations, or to its suggested inexperience which caused it to submit a bid that was too low in the light of specifications for excavation and embankments, restrictions on recruiting labor, or equipment required to complete the job. Petitioner was aware of these things at the time it bid on the contract, and we cannot lightly assume that it did not take them into consideration in making its bid. It was no novice in the construction business in 1939. By the end of that year it had engaged in that business for 15 years, and also had the advantage of the many years of experience of its predecessor. It had done a substantial amount of grading and excavation work, including two road construction jobs—Edmondson Avenue Extension and Liberty Road—performed in 1936–1937 and 1939. Its president testified that when it bid on any job it expected to make a profit, and, although it did not expect to make "too much profit" on the Turnpike contract, it did not expect to sustain a loss. Petitioner's "Unit Cost Data" on the Turnpike contract indicates that the field loss of $126,537.48 was caused by the fact that in making its bid it underestimated the cost of "Class 1 excavation," and several other smaller items. The cost of "Class 1 excavation" was $570,587.63 whereas petitioner contracted to do this excavation for a bid price of $421,816.23. By far the largest single item of cost of Class 1 excavation was $216,283.29 for "Drilling & Blasting."

The Bulletin on Section 722, Part III(A), page 16, issued by the Commissioner of Internal Revenue on November 2, 1944, provides:

The term "economic" includes any event or circumstance, general in its impact or externally caused with respect to a particular taxpayer, which has repercussions on the costs, expenses, selling prices, or volume of sales of either an individual taxpayer or an industry. Thus, not every event or circumstance which has an adverse effect on a taxpayer's profits may serve to qualify that taxpayer for relief under subsection (b)(2). First, the temporary and unusual character of the circumstance or event must be clearly established. Second, the cause of the temporary depression must be shown to be external to the taxpayer, in the sense that it was not brought about primarily by a managerial decision. A taxpayer cannot qualify for relief under subsection (b)(2) because its earnings

were temporarily reduced in the base period in consequence of its own business policies, internally determined. * * *

After a careful consideration of all the evidence relating to the Turnpike contract, we cannot find that the circumstance that caused the loss sustained on that contract was external to the petitioner. The circumstance which caused the loss was an error in judgment made by petitioner in making its bid on the contract. Section 722 "was not designed to counteract errors of business judgment." Cf. *Granite Construction Co.*, 19 T.C. 163, 170. In the circumstances petitioner has not established that it is entitled to have the loss on the Turnpike contract eliminated in the reconstruction of its base period net income. As already noted, without the elimination of this loss its CABPNI is not sufficiently large to provide any relief in excess of the invested capital credits allowed under section 714. Our conclusion is, therefore, that its claim for excess profits relief under section 722(b)(2) must be disallowed.

Petitioner contends, in the alternative, that, if this Court finds that it does not qualify for relief under section 722(b)(2), in computing accumulated earnings and profits for the purpose of determining its excess profits credits for the years 1942 to 1945, inclusive, under the invested capital method, deficiencies in excess profits taxes for such years (including amounts deferred under section 710(a)(5)) may not be deducted as of the end of the year to which they relate.

Petitioner cites in support of this contention *California Vegetable Concentrates, Inc.*, 10 T.C. 1158. In that case the respondent issued a deficiency notice under section 272(a) in which he determined deficiencies in excess profits taxes amounts which the taxpayer had deferred under section 710(a)(5) in conjunction with its claim for relief under section 722. At the time of the issuance of the deficiency notice, respondent had not disallowed the taxpayer's claim for section 722 relief. In support of his inclusion of the deferred amounts in the deficiency notice under section 272(a), respondent contended that his failure to do so would bar subsequent collection of the deferred amounts because section 272(f) prohibited the issuance of a second notice of deficiency. This Court disagreed with the respondent and held that the deferred amounts could be assessed and collected, notwithstanding section 272(f), if the taxpayer's claim for section 722 relief were subsequently disallowed pursuant to section 732(a).

The facts of the instant proceeding differ from those in the *California Vegetable Concentrates* case in that the petitioner's claim under section 722 has been disallowed by this Court. Once such a claim has been rejected the reason for the deferments under section 710(a)(5) no longer exists and the amounts deferred become part of the deficiencies in excess profits taxes due for the years involved. Such

deficiencies must then be deducted from accumulated earnings and profits as of the end of each taxable year to which the deficiencies relate. *Tribune Publishing Co.*, 17 T.C. 1228. Cf. *Green Spring Dairy, Inc.*, 18 T.C. 929.

Reviewed as to section 722 issue by the Special Division.

*Decision will be entered for the respondent.*