DOW JONES AND COMPANY, INC. (DELAWARE) (SUCCESSOR TO FINANCIAL PRESS COMPANIES OF AMERICA AND ITS UNITED STATES SUBSIDIARIES), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 56344. Filed October 29, 1963.

*J. Marvin Haynes*, *N. Barr Miller*, and *Arthur H. Adams*, for the petitioner.

*S. Allen Winborne*, for the respondent.

OPINION

Section 722 of the Internal Revenue Code of 1939,[4] as amended, provides under subsection (a) the general rule that in any case in which a taxpayer establishes that its excess profits tax (computed without the benefit of that section) is excessive and discriminatory and further establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax, the tax shall be determined by using such CABPNI in lieu of the average base period net income otherwise determined. Section 722 further provides, under subsection (b) (2), that the excess profits tax shall be considered to be excessive and discriminatory if the taxpayer's average base period net income is an inadequate standard of normal earnings because "the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer."

The claims involved herein for relief from excess profits taxes for the years 1944 and 1945 are predicated upon alleged qualifying factors within the ambit of only that portion of subsection (b) (2) of section 722 pertaining to a base period depression of taxpayer's business. No issue is presented herein as to the alternative portion of that subsection pertaining to a depression of the industry of which the taxpayer was a member.

Contrary to the respondent's argument on brief, the petitioner does not take the position that the taxpayer was a member of a depressed financial community or industry and patently it was not a member of

---

[4] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayer generally occurring or existing after December 31, 1939, * * *.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * *

(2) The business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

such industry.[5] The record clearly shows that the taxpayer was basically a member of the newspaper publishing industry and that its principal news and advertising medium was the Wall Street Journal, a financial newspaper, which was closely associated with the financial community as a principal source of news, advertising, and subscriber circulation. The taxpayer's Ticker Service was an allied news service furnished by wire and teletype. The petitioner takes the position that certain events caused a temporary and unusual depression of the financial community with the direct result that the taxpayer thereby suffered a temporary and unusual loss of advertising customers of the Wall Street Journal (as distinguished from any cause attributable to ordinary business hazards) which constituted temporary economic circumstances causing a base period depression of the taxpayer's business.

The taxpayer contends that its excess profits taxes are excessive and discriminatory in that its average base period net income is an inadequate standard of normal earnings because of the following alleged qualifying factors:

(1) That the taxpayer's business was severely *depressed* during the base period as evidenced by its low average base period earnings of $230,354 as compared to its long-term 1922–39 average earnings of $594,366.

(2) That those base period depressed earnings were caused by the *economic circumstance* of the loss of a substantial part of the Wall Street Journal's financial advertising linage and revenue and by depression of its circulation.

(3) That such economic circumstance resulted from the repercussion of an acute depression in the financial community caused by the convergence, prior to and during the base period, of a series of events which were both unusual in nature and temporary in their effect upon the financial community.

(4) That the economic circumstance affecting the taxpayer was *unusual* in that no such loss of advertising and depressed circulation, comparable in cause and effect, has ever occurred previously in the Journal's history.

(5) That the economic circumstance affecting the taxpayer was *temporary* as evidenced by the facts that by 1943 the Journal had recaptured or replaced its lost advertising customers and circulation

---

[5] Regulations 112, sec. 35.722–2(b)(8), after stating that no exclusive definition of the concept "industry" can be constructed, provides in part:

In general an industry may be said to include a group of enterprises engaged in producing or marketing the same or similar products or services under analogous conditions which are essentially different from those encountered by other enterprises. * * *

Also, see *Crane Co. of Minnesota*, 25 T.C. 727, 760, and *Pabst Air Conditioning Corporation*, 14 T.C. 427, 428.

showed a substantial increase, and, also, that by 1943 the taxpayer had regained a level of earnings (before an ordinary loss deduction of $598,293 on sale of property used in the business) approximating its long-term average earnings.

The petitioner relies upon the comparison of base period averages with long-term averages in regard to various aspects of the taxpayer's business to establish that it was depressed *in the base period* because of the alleged temporary economic circumstance of the Wall Street Journal's substantial loss of advertising customers and revenues and, also, depressed subscriber circulation. The petitioner relies upon the facts of record in regard to various events adversely affecting the closely associated financial community to establish the external cause of the taxpayer's alleged temporary and unusual loss of a principal group of customers subsequently replaced with new customers. The petitioner cites *Southern California Edison Co.*, 19 T.C. 935 (1953); *Ainsworth Manufacturing Corporation*, 23 T.C. 372 (1954); and *Boonton Molding Co.*, 24 T.C. 1065 (1955), as authority for the granting of relief in the instant case.

In considering the petitioner's contention that the business of the taxpayer was "depressed in the base period," we must look beyond a mere comparison of low average base period earnings to long-term average earnings, for, as we said in *Harlan Bourbon & Wine Co.*, 14 T.C. 97, 104 (1950), "a mere failure to maintain a given level of earnings does not establish a depression of earnings within the meaning of section 722." Also, as we recently pointed out again in *Orangeburg Manufacturing Co.*, 37 T.C. 251 (1961), the term "depressed" involves comparison with that which is standard and normal. Petitioner here places too much reliance on the abnormal earnings it enjoyed during the late twenties when the financial community, its customers, enjoyed an unparalleled and extraordinary prosperity. Those levels of business and earnings were admittedly not normal in the experience of petitioner or its customers, and cannot, therefore, control our determination here. If the years 1927–30 are eliminated as abnormal ones, the revenues, advertising, circulation, and earnings of the base period years all appear to be within normal limits in the light of the circumstances which prevailed throughout the rest of the thirties.

A study of the whole record convinces us that a comparison of base period averages to long-term averages is not all that is required to resolve the questions presented here. Accordingly, we have made rather extensive and detailed findings of fact in order to present the full picture of the condition of the taxpayer's business and the activities and financial situation of its customers during many years prior to, during, and after the base period. In our view, the taxpayer suf-

fered a comparatively low level of earnings not only during the base period, but over an extended period of time, which embraced several years prior to the base period and continued uninterruptedly during that 4-year 1936–39 period and even thereafter until about 1943. It is apparent that the taxpayer lost a substantial group of subscribers, circulation revenue, advertising customers, and advertising revenue long prior to the base period and that the cause thereof may not be characterized as temporary.

This is dramatically illustrated by the following figures showing the Wall Street Journal's financial advertising linage for the base period and other years indicated:

| | |
|---|---:|
| 1931 | 993, 289 |
| 1932 | 490, 245 |
| 1933 | 398, 221 |
| 1934 | 413, 920 |
| 1935 | 468, 975 |
| 1936 | 587, 208 |
| 1937 | 538, 951 |
| 1938 | 379, 642 |
| 1939 | 416, 557 |
| 1940 | 440, 914 |
| 1941 | 444, 584 |
| 1942 | 384, 342 |

The same is true of circulation, the evidence being as follows:

| | |
|---|---:|
| 1931 | 41, 619 |
| 1932 | 31, 195 |
| 1933 | 28, 696 |
| 1934 | 28, 214 |
| 1935 | 26, 041 |
| 1936 | 31, 762 |
| 1937 | 35, 551 |
| 1938 | 32, 400 |
| 1939 | 29, 742 |
| 1940 | 29, 223 |
| 1941 | 30, 004 |
| 1942 | 33, 651 |

Petitioner's principal argument that its base period income was depressed and does not accurately reflect normal earnings because of temporary economic circumstances—to wit: The loss of revenue from circulation and financial advertising because of the unusual situation in the financial community—does not stand up. In two of the base period years, 1936 and 1937, the financial advertising linage in the New York edition of the Wall Street Journal was substantially greater than it was in the immediately preceding 3 years or in the immediately succeeding 5 years. In 1938 there was a general business recession which adversely affected the business of the petitioner and all of its customers. In the last year of the 4-year base period, 1939, the said linage was greater than in 2 of the 3 years immediately preceding the

base period, greater than 1 of the 3 years immediately succeeding it, and approximately equal to the average financial linage for the last-mentioned 3-year period. The average financial advertising linage for the 4 base period years was approximately 480,000 as compared to only 425,000 for the other 6 years of the decade from 1933 to 1943. Financial advertising in the base period years was therefore approximately normal for the petitioner when compared to the rest of the decade, and not substantially less than the average of 520,000 for the 9 years 1931–39, the period immediately following the abnormally high linage of the late 1920's and 1930. The same conclusions are justified with respect to circulation of the Journal. The base period average of 32,000 units is slightly more than the average for the period 1931–39 of 31,000. Any deficiency in earnings during the base period was therefore not due to *temporary* economic circumstances *unusual* in the case of the taxpayer during the base period, but rather to the extended and long-lasting recovery of the financial community from the palmy days of the late twenties, the 1929 market crash, and the acceptance of the newly enacted SEC legislation.

The circumstances involved herein clearly distinguish the instant case from *Southern California Edison Co.*, *supra; Ainsworth Manufacturing Corporation*, *supra;* and *Boonton Molding Co.*, *supra*, wherein customers were lost only *in the base period* because of events which occurred suddenly and unexpectedly.

The record shows that due to speculation there was an abnormally high degree of activity in the various aspects of the securities markets during the late 1920's which was reflected in greatly increased business of the financial community. Also, during the late twenties the taxpayer experienced an abnormally increased amount of financial advertising linage and revenue as compared to earlier years. The business of the financial community continued to be depressed after the market crash by the general depression of the early thirties and thereafter from about 1934 to 1939 was more or less continuously and adversely affected by the resultant effects of investigations, adverse publicity, and the innovation of governmental regulation with regard to the issuance and marketing of securities. The lack of public confidence in the financial community prolonged the entire recovery process. The earnings of the members of the financial community (which are affected, *inter alia*, by volume of trading, number of new issues of securities, and market prices) were generally depressed during the entire decade. We need not speculate on the degree of such depression in any particular year or years since it is clear that the financial community curtailed its financial advertising linage for many years after 1930, and in turn the taxpayer sustained a loss of financial advertising customers and revenues throughout the thirties and into the early forties.

The crucial facts in this case are that, as compared to a very high level of earnings during the late twenties, the taxpayer sustained varying degrees of depressed levels of earnings beginning in 1931 (a year remotely related to the base period) and continuing throughout the thirties because of a series of circumstances and events which were of prolonged duration throughout the thirties and not of a *temporary* nature in the base period years. As we have already pointed out, the record shows clearly that financial advertising linage in the base period was not substantially less than for the immediately preceding 5-year period 1931-35, or the immediately following 3-year period 1940-42. This demonstrates that as compared to the several abnormally high years prior to 1931, the amount of the Journal's financial advertising and revenue had reached a lower level which continued for over a decade under all of the circumstances then obtaining. The tremendous popularity of financial advertising of the late twenties just did not survive the twenty-nine crash or revive during the following decade.

In numerous prior cases in which there was a showing of low base period earnings or even losses, this Court has denied relief where there was a failure to establish that the business of the taxpayer was depressed *in the base period* because of *temporary* and unusual economic circumstances within the meaning of section 722(b)(2). See *Monarch Cap Screw & Manufacturing Co.*, 5 T.C. 1220 (1945); *El Campo Rice Milling Co.*, 13 T.C. 775 (1949); *Harlan Bourbon & Wine Co., supra; Toledo Stove & Range Co.*, 16 T.C. 1125 (1951); *Dr. P. Phillips Canning Co.*, 17 T.C. 1222 (1952); *Kentucky Whip & Collar Co.*, 19 T.C. 743 (1953); *Mitchell & Co.*, 20 T.C. 110 (1953); *Seeck & Kade, Inc.*, 28 T.C. 971 (1957); and *Emporium World Millinery Co.*, 32 T.C. 292 (1959).

In one of our most recent decisions, *A. Finkl & Sons Co.*, 38 T.C. 886 (1962), denying 722(b)(2) relief, we reviewed the authorities and discussed the applicable principles, concluding as follows:

In any event, where taxpayers seek to prevail under 722(b)(2) they must identify the alleged "temporary economic circumstance" and demonstrate its causal connection with the depression in base period earnings. *Trunz, Inc.*, 15 T.C. 99, 103 (1950); *George Moser Leather Co., supra* at 840; *Miami Valley Coated Paper Co.*, 28 T.C. 492, 498 (1957). The event usually relied upon is the loss of one or more members of a small group of major customers. *Southern California Edison Co., supra; Ainsworth Manufacturing Corporation, supra; Boonton Molding Co., supra; Empire Construction Co.*, 31 T.C. 857 (1959). See *S. N. Wolbach Sons, Inc.*, 22 T.C. 152 (1954), for other possible (b)(2) events. Under all these cases it is clear that the reason for such loss must be some unusual, drastic, nonrecurring event and not simply the operation of normal competitive forces. For example, in *Ainsworth Manufacturing Corporation, supra*, the majority of the taxpayer's business was derived from the sale of

brakeshafts to Ford and adjustable windshields to Ford and Chrysler. Both were excellent customers. With little advance warning both customers discontinued use of these products. The taxpayer's plant had been built especially to mass-produce these articles. We granted relief with the observation (23 T.C. at 375) :

> The evidence indicates rather clearly that the earnings of the petitioner, in all probability, would have fluctuated during the base period about in proportion to the average earnings of the industry of which it was a part if the discontinuance of the use of the brakeshafts and adjustable windshields by Ford and Chrysler had not occurred during that period; the earnings of the petitioner fell off to a much greater extent during 1938 and 1939 than they otherwise would have; the unusual falling off of those earnings was due primarily to the loss of the brakeshaft and adjustable windshield business formerly received from Ford and Chrysler; that falling off was temporary and peculiar to the petitioner and perhaps one or two other manufacturers subjected to the same blow; and it was unusual in that nothing even closely comparable in cause, magnitude, and effect had ever occurred in the petitioner's history. * * *

If the taxpayer can show only a general depression and is unable to isolate the particular causative external economic event the inference to be drawn is that the decline is due to normal competitive or cyclical factors and therefore relief will be denied. *Miami Valley Coated Paper Co., supra;* see also *Overland Corporation,* 34 T.C. 1001, 1048 (1960) where we said:

> Not every external cause of depressed earnings is a ground for relief under section 722. The existence of a general business recession in 1938 is not sufficient to justify excess profits tax relief under section 722(b)(2). *Brown Paper Mill Co.,* 23 T.C. 47; *Industrial Yarn Corporation,* 16 T.C. 681; Bulletin on Section 722, p. 17.

Petitioner served a diversified group of customers, there being no one or few customers upon whom it was especially dependent. Thus it is highly dubious that the loss of any particular customer due to unusual factors cognizable under (b)(2) would have had any serious repercussions upon the overall profitability of petitioner's business. On this point, cases such as *Southern California Edison Co., Ainsworth Manufacturing Corporation,* and *Boonton Molding Co.,* all *supra,* are distinguishable. Moreover, petitioner has not produced the slightest evidence that any customers were lost due to unusual events nor has there been demonstrated, of record, any other factor apart from the operation of the normal rules of supply and demand and the usual fluctuations in the business cycle which could have caused a temporary depression in 1936–1939 earnings and thus lead us to conclude that petitioner's base period earnings were an inadequate standard of normal earnings.

Petitioner's situation seems indistinguishable here. The financial community suffered a prolonged decline in its business activities throughout the thirties and with it the petitioner's business inevitably suffered, too. No showing of particular, external economic events has been made from which we might conclude that petitioner's base period earnings are an inadequate yardstick of its normal earnings. As our findings clearly indicate the loss of earnings suffered by peti-

tioner because of a decline in circulation and financial advertising in the base period years was merely the inevitable consequence of a prolonged period of doldrums in the business of the whole financial community. Petitioner has not shown a loss of one or more members of a small group of important customers, and it disavows any claim that it belonged to a depressed industry. All of its customers, being affected by the long-term financial sluggishness of the thirties, cut down on their advertising, services, subscriptions, and other business done with petitioner. As we study the record presented here, this was long standing, protracted, and general rather than unusual, temporary, nonrecurring, or peculiar to the base period years of this petitioner.

The reliance of petitioner on our decision in *Dyer Engineers, Inc.*, 10 T.C. 1265 (1948), is misplaced. That case is readily distinguishable on the facts. There, we recognized a distinction between changes in conditions brought about by legislation, which we have long held do not give rise to relief under section 722, and changes brought about by temporary reactions to legislation which depress a taxpayer's earnings. In *Dyer* the taxpayer proved that labor was vigorously antagonistic to its business operations and opposed the introduction and use of the Dyer systems in plants of its employers. It was this direct reaction of labor, following enactment of the Wagner Act, against the taxpayer's business that was held to be a temporary economic circumstance that depressed the base period business of the petitioner there. Such temporary reactions following legislative action are distinguishable from the situation disclosed by the record here. Cf. *Orangeburg Manufacturing Co.*, *supra; Kentucky Whip & Collar Co.*, *supra.*

Upon a consideration of the whole record in the instant case, we conclude that the business of the taxpayer was *not* "depressed in the base period because of *temporary* economic circumstances unusual in the case of such taxpayer" (emphasis supplied) within the meaning of subsection (b) (2) of section 722. The taxpayer has been allowed the relief provided for under section 713 (e) (1) whereby the actual average base period net income was increased by substituting for the 1938 deficit an amount equal to 75 percent of the average for the other base period years.

Since we have concluded that the taxpayer has failed to qualify for relief, there is no need to discuss the petitioner's proposed constructive average base period net income.

The respondent's determination of disallowance, in full, of petitioner's claims for section 722 relief and for refund of excess profits taxes for the years 1944 and 1945, is sustained.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*