## AINSWORTH MANUFACTURING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 25767, 29171. Filed November 30, 1954.

*Robert S. Marx, Esq., Lawrence I. Levi, Esq.,* and *Herbert N. Weingarten, Esq.,* for the petitioner.

*William J. Stetter, Esq.,* and *W. T. Holloran, Esq.,* for the respondent.

### OPINION.

MURDOCK, *Judge:* The Commissioner of Internal Revenue disallowed claims of the petitioner for excess profits tax relief under section 722 (a), (b) (2), (b) (4), and (b) (5) of the Internal Revenue Code of 1939 for the taxable years 1941 through 1945.

One of the contentions of the petitioner is that its average base period net income is an inadequate standard of normal earnings within the meaning of section 722 (b) (2) because its business was depressed in the base period by the discontinuance of the use of its two principal products, brakeshafts for Ford and adjustable windshields for Ford and Chrysler, as a result of which it suddenly lost the larger part of its business and was required to make substantial changes so that it could turn to the profitable manufacture of other products. It makes a further claim under subsection (b) (2) based upon an alleged price war. It also makes claims under subsection (b) (4) and subsection (b) (5) based essentially upon the discontinuance of the use of the brakeshafts and adjustable windshields. The Commissioner concedes that its commitment prior to January 1, 1940, to purchase a tube mill represented a change in the character of its business within the meaning of subsection (b) (4). Findings of fact have been made and served upon the parties and will not be repeated herein.

The average base period net income of the petitioner was as follows:

| Year | Net income |
|------|-----------|
| 1936 | $1,166,149.24 |
| 1937 | 1,130,757.68 |
| 1938 | (45,950.73) |
| 1939 | 181,953.23 |
| Total | $2,432,909.42 |
| Average | 608,227.36 |

The average base period net income of the petitioner under section 713 (e) is $619,715.04 for 1941 and $774,643.80 for the years 1942 through 1945. The petitioner is claiming that it is entitled to construct an average base period net income of $1,200,000 under the provisions of section 722.

The following table shows the excess profits net income computed under the income credit method and the excess profits tax liability, without the benefit of section 722, of the petitioner for the taxable years:

| Year | Excess profits net income | Excess profits tax liability |
|------|---------------------------|------------------------------|
| 1941 | $1,303,985.39 | $225,655.11 |
| 1942 | 1,556,849.42 | 734,344.03 |
| 1943 | 1,298,429.65 | 501,766.24 |
| 1944 | 1,692,498.98 | 899,258.00 |
| 1945 | 1,015,473.56 | 230,475.46 |

It is conceded that the taxpayer is entitled to use the excess profits credit based on income pursuant to section 713. Section 722 (b) (2) provides, in the case of taxpayers using the average earnings method, that the tax computed under Subchapter E, without the benefit of section 722, shall be considered to be excessive and discriminatory if its average base period net income is an inadequate standard of normal earnings because the business of the taxpayer was depressed in the base period by reason of temporary economic circumstances unusual in the case of that taxpayer. The taxpayer's argument is that two separate and distinct events depressed its business during the base period. The more important one was the temporary loss of business caused by the decisions of Ford and Chrysler to discontinue the use of adjustable windshields and mechanical brakes in 1937 and 1938. The evidence of the temporary depression in the petitioner's business due to this cause is sufficient to qualify the petitioner for relief under section 722 (b) (2).

The petitioner was set up to produce brakeshafts and adjustable windshields on a mass production basis. It had built up its net sales until they reached $6,415,671 in 1934 and they continued to grow and reached $9,176,666 in 1936. Seventy per cent of its net sales for the latter year was of brakeshafts and adjustable windshields and 64 per cent of its gross sales for 1936 was represented solely by the sale of adjustable windshields to Ford and Chrysler. It was becoming apparent in the first part of the base period that hydraulic brakes and fixed windshields (in conjunction with other means of ventilating the interior of cars) would supplant mechanical brakes and adjustable windshields in motor cars, but the petitioner had two excellent customers in Ford and Chrysler, Ford had given the petitioner no warning prior to April 1937 that it might soon discontinue the use

of mechanical brakes, and neither Ford nor Chrysler had warned the petitioner prior to that time that they were contemplating a change to fixed windshields. The petitioner's plant was built and arranged to produce those articles in large quantities and its best interests required it to continue the mass production of those articles as long as it could do so profitably. It had just completed and put into operation, in the early part of 1937, a new plant designed primarily for the production of brakeshafts and windshields. Ford, suddenly and considerably later with respect to the new model than might have been expected, advised the petitioner in April 1937 that it was going to discontinue the use of mechanical brakes and its 1938 models would be equipped with hydraulic brakes. Chrysler, also in April 1937, advised the petitioner that it was discontinuing the use of adjustable windshields and its 1938 models would have fixed windshields. The petitioner had not been told previously and had not expected that those changes would take place on the 1938 model cars. Then Ford advised the petitioner in March or April of 1938 that it was going to use fixed windshields on its 1939 models.

Ford and Chrysler began to manufacture their 1938 models in the fall of 1937 and began to manufacture their 1939 models in the fall of 1938 so that the devastating effect of these changes upon the petitioner's earnings was not immediate. The 1937 net sales were only $194,286 less than those for 1936, and the petitioner's total income for that year was a little larger than that for 1936 while its net income was only about $43,000 less. However, the effect of the discontinuance of the general use of adjustable windshields and to a lesser extent the effect of the complete discontinuance of the use of mechanical brakes by the two customers was a devastating blow to the petitioner's business in 1938. Its net sales fell off to the extent of over $5,341,000 as compared to 1937. Its total income decreased in the amount of $1,319,357 in 1938 from what it had been in 1937, and the net result of its operations for the year was a loss of $45,951 whereas its net income for the 3 previous years had averaged $1,179,691.

The petitioner, as soon as it received the bad news from Chrysler and Ford in 1937, gave immediate consideration to the problem of determining what other parts it could profitably manufacture on a mass production basis for which it might possibly obtain substantial orders, particularly orders from Ford and Chrysler. The latter were interested in having the petitioner continue as a supplier of parts for their cars but were not willing to take their orders away from other satisfactory suppliers merely to continue the petitioner's business. The petitioner investigated the possibilities and decided what it would do. It then had to spend substantial amounts of time and money,

particularly during 1938 and 1939, in developing processes and techniques and in designing, building, and installing machinery and equipment for use in manufacturing products which would fill the gap in its business left by the loss of the brakeshaft and adjustable windshield orders. The petitioner began to recover somewhat in 1939 from the blow which had crippled its business in 1938. Its net sales increased by about $1,500,000 and its net income was $181,953 for the year. Its subsequent activities show that it was successful in changing over from the mass production of brakeshafts and adjustable windshields to the manufacture of other articles on a profitable mass production basis, as a result of which its earnings, even discounting, as well as possible, war work and war economy, again rose to approximate those which it had enjoyed prior to 1938.

The evidence indicates rather clearly that the earnings of the petitioner, in all probability, would have fluctuated during the base period about in proportion to the average earnings of the industry of which it was a part if the discontinuance of the use of the brakeshafts and adjustable windshields by Ford and Chrysler had not occurred during that period; the earnings of the petitioner fell off to a much greater extent during 1938 and 1939 than they otherwise would have; the unusual falling off of those earnings was due primarily to the loss of the brakeshaft and adjustable windshield business formerly received from Ford and Chrysler; that falling off was temporary and peculiar to the petitioner and perhaps one or two other manufacturers subjected to the same blow; and it was unusual in that nothing even closely comparable in cause, magnitude, and effect had ever occurred in the petitioner's history. The bulletin prepared by the Bureau of Internal Revenue on section 722 at page 16, part III, states: "The term 'economic' includes any event or circumstance * * * externally caused with respect to a particular taxpayer, which has repercussions on the costs, expenses, selling prices or volume of sales of * * * an individual taxpayer * * *." That provision has been quoted with approval. *Foskett & Bishop Co.*, 16 T. C. 456; *Toledo Stove & Range Co.*, 16 T. C. 1125; *Granite Construction Co.*, 19 T. C. 163, 170. It covers the present case. The petitioner also qualifies under Regulations 112, section 35.722–3 (b) and the example there given. This case is not distinguishable in principle from *Southern California Edison Co.*, 19 T. C. 935. There too the loss of the business of several large customers and the period of adjustment were the bases recognized for relief under section 722 (b) (2). The arguments used there by the Commissioner are substantially the same as those he advances here. The business of the petitioner was depressed in the base period because of temporary economic circumstances, unusual in the case of

this taxpayer within the meaning of section 722 (b) (2) and as a result its average base period net income is an inadequate standard of normal earnings.

The Court, in reaching this conclusion, has not been unaware of the history of the petitioner prior to 1934 during which period its averages of net sales, total income, and net income are not nearly as high as its similar averages after 1933. The evidence as a whole justifies the belief that the volume of the business of the petitioner had become reasonably well established by 1934 and it is proper, under all of the circumstances, to recognize a higher normal level of earnings for present purposes than might be justified by averages which would give the same recognition to the figures for the period prior to 1934 as would be given to the figures after 1933. Cf. *Austin Co.*, 22 T. C. 703.

The other event upon which the petitioner relies to qualify for relief under section 722 (b) (2) is an alleged price war instituted by Briggs in late 1937 which increased in 1938 and lasted until 1940 or 1941. The evidence to support this contention is not convincing proof that more than severe competition occurred and that is not sufficient to qualify for relief under section 722 (b) (2).

The petitioner makes the contention that the discontinuance of the brakeshaft and adjustable windshield business by Ford and Chrysler also qualifies it for relief under section 722 (b) (4) and (5), but those contentions do not require consideration in view of the holding that it qualifies on this basis under section 722 (b) (2). The petitioner refers to some patent litigation which it argues prevented it from making ventilated front windows for Chrysler, but we are not able to observe any basis for relief in that argument.

Another contention is that its commitment prior to January 1, 1940, to purchase a tube mill represented a change in the character of its business as a result of which its average base period net income does not reflect the normal operation of the business for the entire base period within the meaning of subsection (b) (4). The Commissioner admits that the commitment in 1939 to acquire the tube mill satisfies the qualification provisions of section 722 (b) (4) so that the only question under this subsection is whether the earnings of the petitioner from the operation of the tube mill would have been greater by the end of the base period if the commitment had been made 2 years sooner. The petitioner contends that if the tube mill had been put into operation during the base period, it would have produced 2,000 feet of tubing per hour, 16 hours during 250 production days of the year; the cost of the tubing would have been 5.24 cents per foot and

it would have been sold for 6 cents per foot; there would have been annual sales of tubing in the amount of $480,000 and net income of $60,800. These claims are not fully justified by the record. Such an estimated supply of tubing would have flooded the market and certainly would have been substantially in excess of the business which the petitioner might have expected from Ford and Chrysler. The sales price of 6 cents per foot seems unduly optimistic. Furthermore, the petitioner would have been required to pay patent royalties if it had operated the tube mill during the base period years and that burden cannot be ignored in the computation. Cf. *Fezandie & Sperrle, Inc.*, 5 T. C. 1185; *Clinton Carpet Co.*, 14 T. C. 581. Consequently, it does not appear that the petitioner is entitled to much relief, if any, as a result of this commitment and the problem of the amount of relief relates principally to the claim based upon the loss of the brakeshaft and adjustable windshield business.

The amount of relief claimed by the petitioner is substantially in excess of that which is justified by the facts of record. Due consideration has been given, however, to the theories of construction of average base period net income advanced by the several witnesses and consideration has likewise been given to all of the evidence in the record that bears upon this subject. The conclusion has been reached that a fair and just amount to be used as constructive average base period net income for the purpose of section 722 (a) is $850,000.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*