*Decision will be entered under Rule 50.*

INTERSTATE MILLING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27955. Filed August 13, 1959.

*Fleming Bomar, Esq.*, and *Joseph E. McAndrews, Esq.*, for the petitioner.

*S. A. Winborne, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent disallowed the petitioner's applications for relief under section 722 of the Internal Revenue Code of 1939, for the calendar years 1942, 1943, 1944, and 1945, and the related claims for refund. The petitioner seeks refund of excess profits taxes for those years in the respective amounts of $7,665.15, $52,346.11, $16,678.11, and $26,897.09. The petitioner at the hearing limited its claim to the ground that its business was depressed during the base period because of temporary economic circumstances unusual in its case, within the meaning of section 722(b)(2).

### FINDINGS OF FACT.

Some of the facts are stipulated and the stipulations are incorporated herein by this reference.

The petitioner is a corporation organized under the laws of North Carolina in 1915 with its office and plant located in Charlotte, North Carolina. It filed its income and excess profits tax returns for all years in question on a calendar year basis and an accrual method, with the collector of internal revenue at Greensboro, North Carolina.

The petitioner in 1916 commenced the business of milling and sale of flour. Its capital stock up to 1939 was $400,000. In that year

$100,000 of its stock was retired. During the base period years and the years in issue the petitioner was engaged in the milling and sale of flour, mixed feed, cornmeal, and corn grits. Through the years and up to and including the base period years the petitioner's principal product was wheat flour, the bulk of which was milled from soft red wheat and used primarily for home baking of biscuits, cakes, and pastries. The product was sold under brand names during the period 1930 through 1939 to wholesalers and chain stores, and to retail stores within trucking distance of petitioner's plant. The areas in which the product was sold included North Carolina, South Carolina, Georgia, and Florida.

The petitioner generally purchased its wheat, through wheat brokers, from the States of North Carolina, Virginia, Maryland, Pennsylvania, Ohio, Illinois, and Kentucky. The wheat purchased was delivered to the petitioner by rail under milling in transit rates, whereby the same rate is charged for delivery of the wheat and delivery of the finished product, the process of milling the wheat into flour being considered merely a stopover.

The petitioner first cleaned the wheat and then, by a process of cracking and separation, it was milled into flour. Then through a blending process the petitioner added self-rising ingredients to about 75 per cent of the flour it sold.

A byproduct of the cracking and separation was mill feed, which was packaged and sold for feed. About 1934 the petitioner commenced the production of corn grits and cornmeal. The volume, shown in short tons, of flour, feed, grits, meal, and mill feed sold by the petitioner during the period 1929 through 1945, was as follows:

| Year | Flour | Feed | Grits | Meal | Mill feed | Total of all sales | Per cent of flour sales to total sales |
|------|-------|------|-------|------|-----------|--------------------|-----------------------------------------|
| | | | | Tons | | | |
| 1929 | 13,747 | 0 | 0 | 0 | ---------- | 13,747 | 100 |
| 1930 | 12,197 | 5,854 | 0 | 0 | ---------- | 18,051 | 68 |
| 1931 | 11,197 | 8,569 | 0 | 0 | ---------- | 19,766 | 57 |
| 1932 | 12,059 | 6,174 | 0 | 0 | ---------- | 18,233 | 66 |
| 1933 | 13,873 | 5,398 | 0 | 0 | ---------- | 19,271 | 72 |
| 1934 | 15,715 | 5,436 | 1,423 | 0 | ---------- | 22,574 | 70 |
| 1935 | 13,628 | 6,119 | 1,710 | 1,774 | ---------- | 23,231 | 59 |
| 1936 | 10,520 | 6,759 | 1,821 | 1,844 | ---------- | 20,944 | 50 |
| 1937 | 6,992 | 8,935 | 1,676 | 1,609 | ---------- | 19,212 | 36 |
| 1938 | 9,006 | 6,248 | 1,149 | 1,190 | ---------- | 17,593 | 51 |
| 1939 | 10,514 | 5,881 | 1,285 | 2,944 | ---------- | 20,624 | 51 |
| 1940 | 7,465 | 4,790 | 2,065 | 6,932 | 3,313 | 24,565 | 30 |
| 1941 | 7,122 | 6,143 | 2,309 | 4,135 | 2,995 | 22,704 | 31 |
| 1942 | 7,753 | 7,265 | 1,785 | 4,359 | ---------- | 21,162 | 36 |
| 1943 | 6,220 | 13,131 | 371½ | 826 | ---------- | 20,548½ | 30 |
| 1944 | 5,605 | 10,983 | 414 | 901 | 7,190 | 25,093 | 22 |
| 1945 | 8,110 | 12,391 | 1,236 | 850 | 4,932 | 27,519 | 29 |

Base period average—47 per cent.
Post base period average—30 per cent.

There were a number of local millers, located in the States of North Carolina, South Carolina, and Tennessee, who were in competition

with the petitioner. These competitors also had the advantage of milling in transit shipping rates, and the market for family flour in the area was very competitive in the 1920's and 1930's. The petitioner also in the 1930's had some competition from national flour manufacturers, but it was not substantial except in certain cities, as for example, Jacksonville, Florida.

During the early 1920's the world markets were profitable for the United States flour mills and wheat growers because much of the wheat-producing land in Europe had gone out of production and some flour mills had been destroyed during World War I. However, about the mid-1920's many European countries embarked on policies of economic nationalism, which included increased production of wheat in countries which previously had been considered large importers of wheat and flour. By 1930 the prices of wheat were very low.

The United States flour mill industry is generally divided into four areas, one of which is the southeastern area, where soft red wheat is milled, and another of which is the Pacific Northwest, where soft white wheat is milled. The Pacific Northwest mills were located mainly in the States of Washington and Oregon, and during the 1930's were newer, larger, and more efficient than the southeastern mills. However, their wage rates were higher than those paid by the southeastern millers. They had large production capacity and approximately one-half of their flour was intended for export, the principal export area being the Orient. Prior to 1930 and during part of the 1930's the Pacific Northwest mills did not market to any substantial degree in any of the other areas of the United States. Starting in about 1933 the exports of flour from the Pacific Northwest to the Orient declined drastically to a low point in 1935. This situation continued through 1938, but by 1939 the exports to the Orient had again reached the pre-1933 level. The following table shows the amount of wheat flour, in thousands of barrels, exported from the customs districts of Washington and Oregon:

| 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|---|---|
| 3,149 | 2,312 | 975 | 1,210 | 447 | 507 | 1,058 | 1,656 | 3,613 |

This experience of the Pacific Northwest area was in substantial accord with the total of exports from the United States of wheat flour, in thousands of barrels, to the following countries in the Orient during the years indicated:

| | 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|---|---|---|
| China | 1,142 | 1,098 | 41 | 350 | 8 | 6 | 18 | 225 | 1,347 |
| Hongkong | 754 | 479 | 298 | 182 | 69 | 32 | 205 | 229 | 390 |
| Philippine Islands | 678 | 574 | 507 | 486 | 248 | 363 | 527 | 879 | 1,059 |
| Japan | 49 | 5 | 1 | 4 | 5 | 2 | 7 | 1 | 187 |
| Total | 2,623 | 2,156 | 847 | 1,022 | 330 | 403 | 757 | 1,334 | 2,983 |

Among the factors adversely affecting the export of wheat flour from the United States to the Orient during the 1930's were: The

competition of the millers of the wheat-exporting countries of Canada, Australia, and Argentina, who were able to sell flour at lower prices on a competitive basis; the Chinese-Japanese war which commenced in the early 1930's; a depression which the Orient was experiencing; and currency difficulties in Japan.

The decline in flour exports by the Pacific Northwest mills to the Orient resulted in the accumulation of a large surplus of wheat on the Pacific coast.

Beginning about 1933 and continuing until about 1939, large quantities of soft white wheat and soft white wheat flour were shipped from the Pacific Northwest into the southeastern area of the United States in which the petitioner sold its products. Shipment was by way of the Panama Canal. The distance was approximately 5,000 miles, and each trip took approximately 30 days. Water transportation rates existing during the 1930's were very low. Much of the Pacific Northwest wheat was also shipped to other areas in the United States in order to alleviate the surplus in that area.

The following tabulation shows the number of long tons of wheat flour shipped from west coast ports into the southeastern ports during the years 1924 through 1939:

| Year | Wilmington, North Carolina | Charleston, South Carolina | Savannah, Georgia | Jacksonville, Florida | Total |
|------|------|------|------|------|------|
| 1924 | 0 | 1,241 | 0 | 0 | 1,241 |
| 1925 | 0 | 3,072 | 131 | 0 | 3,203 |
| 1926 | 0 | 5,891 | 0 | 375 | 6,266 |
| 1927 | (1) | (1) | (1) | (1) | --------- |
| 1928 | (1) | (1) | (1) | (1) | --------- |
| 1929 | 0 | 2,806 | 1,837 | 258 | 4,901 |
| 1930 | 40 | 1,269 | 37 | 370 | 1,716 |
| 1931 | 0 | 752 | 0 | 174 | 926 |
| 1932 | 0 | 634 | 16 | 0 | 650 |
| 1933 | 2,088 | 13,793 | 3,731 | 4,297 | 23,909 |
| 1934 | 6,268 | 16,719 | 9,849 | 19,278 | 52,114 |
| 1935 | 6,250 | 27,612 | 22,624 | 49,699 | 106,185 |
| 1936 | 5,822 | 26,471 | 17,733 | 42,408 | 92,434 |
| 1937 | 3,878 | 24,255 | 17,104 | 35,576 | 80,813 |
| 1938 [2] | 2,172 | 10,484 | 11,696 | 21,147 | 45,499 |
| 1939 [2] | 0 | 3,993 | 3,161 | 12,460 | 19,614 |

[1] No records.
[2] The figures shown for the years 1938 and 1939 are for "Grain Products Dry," a broader classification which included, among other items, wheat flour.

The following table shows the number of long tons of flour moving eastbound in the United States intercoastal trade through the Panama Canal from 1927 through 1945:

| Fiscal year | Long tons | Fiscal year | Long tons |
|------|------|------|------|
| 1927 | 57,689 | 1937 | 219,069 |
| 1928 | 63,531 | 1938 | 187,921 |
| 1929 | 77,385 | 1939 | 115,597 |
| 1930 | 64,580 | 1940 | 126,415 |
| 1931 | 71,385 | 1941 | 97,627 |
| 1932 | 65,389 | 1942 | 25,855 |
| 1933 | 121,506 | 1943 | None |
| 1934 | 213,914 | 1944 | ------- |
| 1935 | 281,008 | 1945 | ------- |
| 1936 | 296,683 | | |

The Pacific Northwest flour shipped to the southeastern ports entered into competition with that produced by the petitioner. The quality of the Pacific Northwest soft white wheat flour was comparable to that milled by petitioner and other manufacturers in the southeastern area. There was little demand in the Pacific Northwest for self-rising flour and the self-rising ingredients do not ship well by water. However, since the demand in the southeastern area was for self-rising flour, some of the Pacific Northwest mills, and others, including at least one of the petitioner's local competitors, about 1934 set up blending plants, at a relatively low cost of construction, in the southeastern ports of Jacksonville, Savannah, Charleston, Wilmington, and Mobile. The blending process was comparatively simple, was the last step in converting wheat into self-rising family flour, and consisted merely of mixing self-rising ingredients into the flour. The flour was then packaged for sale in bags of the same size used by the petitioner. The flour from these blending plants was distributed generally by truck and sold in direct competition with petitioner's family flour. It was offered to customers of the petitioner at a price below the petitioner's price. As a consequence the petitioner was forced to lower its prices. In an effort to compete, the petitioner purchased wheat from its normal buying areas at lower prices and also purchased up to one-third of its yearly wheat requirements from the Pacific Northwest. It also intensified efforts to acquire new customers and tried to increase sales of other products.

Practically all of these blending plants located in the southeastern ports had ceased operations by 1939 or 1940.

In 1933 the Agricultural Adjustment Act was enacted to benefit farmers and in the same year an export subsidy program for wheat was put into effect on the west coast. This subsidy proved to be inadequate to regain the export market. In 1936 the Agricultural Adjustment Act was invalidated. Late in 1938 the United States Government set up the Commodity Credit Corporation to make non-recourse loans to wheat farmers, taking the wheat as collateral. The purpose of this program was to keep the price of wheat stable. If the price of wheat dropped below the amount of the loan, the wheat was taken over by the United States Government. Loans were made to the Pacific Northwest farmers on their wheat at a substantially higher level than the prevailing market price elsewhere, thereby creating artificially a higher price, and the Commodity Credit Corporation acquired large amounts of wheat from that area. About the same time the United States Government also employed several devices in an attempt to increase the export of wheat, including the granting of export subsidies for flour. Loans were also made to Nationalist China earmarked for the purchase of flour. Another factor affecting the shipments of wheat and flour from the Pacific

Northwest to the southeastern area was an increase in water shipping rates about 1939 caused by the war situation.

The petitioner has never used an accounting system from which the cost of, and the profit on, each product manufactured and sold could be determined accurately. Its plant was integrated and petitioner's management believed that the extra expense incurred in keeping the additional records would not have been justified. The only way the petitioner could arrive at the profit on any given product was to allocate the total net profit among the various products in the proportion of the quantity of each sold.

The petitioner's net sales and net income, per tax returns after audit by the Internal Revenue Service, for the years 1922 through 1945, are shown in the following table:

| | Net sales | Cost of goods sold | Gross profit | Total income | Total deductions | Net income |
|---|---|---|---|---|---|---|
| 1922 | $1,609,560.14 | | | | | $145,256.53 |
| 1923 | 1,634,019.12 | | | | | 124,404.14 |
| 1924 | 1,908,578.18 | | | | | 132,566.95 |
| 1925 | 2,305,349.81 | | | | | 182,102.20 |
| 1926 | 2,037,869.51 | | | | | 96,775.65 |
| 1927 | 1,790,494.09 | | | | | 102,802.55 |
| 1928 | 1,830,775.00 | | | | | 101,373.05 |
| 1929 | 1,326,619.74 | | | | | 86,361.97 |
| 1930 | 1,250,952.56 | $1,082,671.49 | $168,281.07 | $168,929.26 | $120,795.72 | 48,133.54 |
| 1931 | 1,007,083.04 | 844,349.55 | 162,733.49 | 163,413.96 | 106,901.31 | 56,512.65 |
| 1932 | 773,285.66 | 647,234.95 | 126,050.71 | 128,161.25 | 98,004.71 | 30,156.54 |
| 1933 | 1,122,053.67 | 956,754.84 | 165,298.83 | 169,234.44 | 92,501.68 | 76,732.76 |
| 1934 | 1,641,366.51 | 1,357,323.37 | 284,043.14 | 286,772.33 | 106,133.90 | [1] 180,638.43 |
| 1935 | 1,488,300.00 | 1,223,360.72 | 264,939.28 | 267,134.81 | 115,165.14 | [2] 151,969.67 |
| 1936 | 1,149,997.02 | 1,002,619.07 | 147,377.95 | 151,687.16 | 87,954.67 | 63,732.49 |
| 1937 | 1,150,746.39 | 1,047,700.81 | 103,045.58 | 109,013.89 | 105,592.27 | 3,421.62 |
| 1938 | 840,084.52 | 729,488.67 | 110,595.85 | 113,913.77 | 90,126.06 | 23,787.71 |
| 1939 | 988,845.96 | 861,548.08 | 127,297.88 | 131,740.46 | 85,361.62 | 46,378.84 |
| 1940 | 1,079,443.48 | 964,482.24 | 114,961.24 | 118,418.46 | 89,509.58 | 28,908.88 |
| 1941 | 1,034,965.67 | 896,983.19 | 137,982.48 | 141,298.65 | 93,426.06 | 47,872.59 |
| 1942 | 1,314,415.32 | 1,166,632.37 | 147,782.95 | 150,060.12 | 96,712.27 | 53,347.85 |
| 1943 | 1,761,888.30 | 1,535,252.44 | 226,635.86 | 228,901.96 | 122,708.46 | 106,193.50 |
| 1944 | 1,704,247.57 | 1,517,207.12 | 187,040.45 | 189,096.00 | 116,620.05 | 72,475.95 |
| 1945 | 1,945,294.54 | 1,712,359.73 | 232,934.81 | 236,089.42 | 151,661.44 | 84,427.98 |

[1] Of the $180,638.43 net income per R.A.R. for 1934, the sum of $101,379.67 represented accrued but unpaid processing taxes disallowed as a deduction by the revenue agent.

[2] Of the $151,969.67 net income per R.A.R. for 1935, the sum of $154,661.76 represented accrued but unpaid processing taxes disallowed as a deduction by the revenue agent. In a subsequent closing agreement under Titles III and VII of the Revenue Act of 1936 the petitioner agreed that its total taxable income for purpose of these titles was $112,107.71 for 1935 and 1936 and agreed to and paid additional net unjust enrichment taxes of $19,221.07, making a total unjust enrichment tax of $69,918.06 applicable to such period.

The petitioner's excess profits net income for each of the years 1940 through 1945, computed in accordance with section 711(a) of the Internal Revenue Code of 1939, is as follows:

| Year | Excess profits net income | Year | Excess profits net income |
|---|---|---|---|
| 1940 | [1] $28,423.46 | 1943 | $106,161.41 |
| 1941 | [1] 47,872.59 | 1944 | 72,475.95 |
| 1942 | 53,268.11 | 1945 | 84,427.98 |

[1] For carryover purposes only.

Petitioner's income and excess profits tax liability, prior to the application of section 722 of the Internal Revenue Code of 1939, as

finally determined by the respondent and as agreed to by the petitioner for each of the years 1942 to 1945, inclusive, was as follows:

| Year | Income tax liability | Excess profits tax liability |
|---|---|---|
| 1942 | $17,260.44 | $7,665.15 |
| 1943 | 18,956.51 | 52,346.11 |
| 1944 | 21,187.75 | 16,678.11 |
| 1945 | 21,187.75 | 26,897.09 |

Petitioner's excess profits credit computed under the invested capital method for the years 1940 and 1941 and under the income method for the years 1942 through 1945, without application of section 722, is as follows:

| Year | Excess profits credit | Year | Excess profits credit |
|---|---|---|---|
| 1940 | $38,398.26 | 1943 | $42,999.06 |
| 1941 | 37,859.01 | 1944 | 42,969.39 |
| 1942 | 39,751.28 | 1945 | 42,969.39 |

The following schedule shows petitioner's excess profits net income for each of the base period years computed under section 711, and the average base period net income, computed under section 713(e) of the Internal Revenue Code of 1939, without application of section 722, and the resulting excess profits credits for the years 1942 to 1945, inclusive:

| | 1936 | 1937 | 1938 | 1939 | Net aggregate |
|---|---|---|---|---|---|
| **Applicable to 1942:** | | | | | |
| Net income | $63,732.49 | $3,421.62 | $23,787.71 | $46,378.84 | $137,320.66 |
| Adjustments | | | | | |
| Excess profits net income | 63,732.49 | 3,421.62 | 23,787.71 | 46,378.84 | 137,320.66 |
| **Applicable to 1943:** | | | | | |
| Net income | 63,732.49 | 3,421.62 | 23,787.71 | 46,378.84 | 137,320.66 |
| Abnormal deductions disallowed under sec. 711(b)(1)(J): | | | | | |
| Auditing fees | 1,950.00 | 1,384.66 | | | |
| Bad debts | | | 7,208.19 | | |
| Interest expense | | 2,515.01 | | 1,781.74 | |
| Excess profits net income | 65,682.49 | 7,321.29 | 30,995.90 | 48,160.58 | 152,160.26 |
| **Applicable to 1944 and 1945:** | | | | | |
| Net income | 63,732.49 | 3,421.62 | 23,787.71 | 46,378.84 | 137,320.66 |
| Abnormal deductions disallowed under sec. 711(b)(1)(J): | | | | | |
| Auditing fees | 1,850.00 | 1,384.66 | | | |
| Bad debts | | | 7,208.19 | | |
| Interest expense | | 2,515.01 | | 1,781.74 | |
| Excess profits net income | 65,582.49 | 7,321.29 | 30,995.90 | 48,160.58 | 152,060.26 |

| | Applicable to— | | |
|---|---|---|---|
| | 1942 | 1943 | 1944 & 1945 |
| Net aggregate of base period excess profits net income—above | $137,320.66 | $152,160.26 | $152,060.26 |
| Adjustment under section 713(e)(1) to increase 1937 earnings to three-fourths of average of other 3 years in base period | 30,053.14 | 28,888.41 | 28,863.48 |
| Adjusted net aggregate | 167,373.80 | 181,048.67 | 180,923.74 |
| Average base period net income (one-fourth of adjusted net aggregate) | 41,843.45 | 45,262.17 | 45,230.94 |
| Excess profits credit: | | | |
| 95 per cent of average base period net income | 39,751.28 | 42,999.06 | 42,969.39 |

On September 16, 1943, the petitioner filed an application for relief, Form 991, under section 722 (a) and (b) (2) and (3) of the Internal Revenue Code of 1939, with respect to its taxable year 1942. On March 13, 1947, it filed an amended application for such year and

also filed applications for such relief for the taxable years 1943, 1944, and 1945. In these applications it claimed refunds of all excess profits taxes paid for those years.

The respondent by statutory notice advised the petitioner that after consideration of the applications for relief under section 722, it had been determined that the petitioner had not established its right to the relief requested, and that the claims for refund asserted in the applications were disallowed.

OPINION.

The issue presented is whether the petitioner is entitled to relief from excess profits taxes for the years 1942, 1943, 1944, and 1945, pursuant to section 722(a) and the first clause of section 722(b)(2) of the Internal Revenue Code of 1939,[1] it having specifically abandoned reliance upon section 722(b)(3)(A) and (B) and the last clause of section 722(b)(2).

The issue, then, is whether the petitioner has met its burden of showing that its average base period net income is an inadequate standard of normal earnings for the reason that its business was depressed in the base period because of temporary economic circumstances unusual in the case of the petitioner.

During the base period years 1936 to 1939, as well as during the years in question, 1942 through 1945, the petitioner was engaged in the milling and sale of flour, mixed feed, cornmeal, and corn grits. Beginning about 1933 and continuing until about 1939 large quantities of soft white wheat and soft white wheat flour were shipped from the Pacific Northwest into the southeastern area in which the petitioner sold its products. Blending plants were set up by the

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939 * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

Pacific Northwest millers and others in the petitioner's area and self-rising flour was produced which entered into direct competition with the petitioner's self-rising flour.

The petitioner contends that shipment of flour from the west coast to the southeastern area had an adverse effect on the flour segment of its business, causing a depression in its business in the base period years, and that this constituted a temporary economic circumstance unusual in the case of the petitioner, entitling it to the relief requested.

The parties are not in disagreement as to the fact that the petitioner's average net income was substantially lower during the base period years than over the period 1922 through 1939. The petitioner's average annual net income during the base period years was $34,330, which was about 43 per cent of the average annual net income of $79,978.88 for the period 1922 through 1939 (eliminating from income of 1934 and 1935 that portion resulting from unpaid processing taxes). The average base period net income, as computed under section 713 (e), without application of section 722, ranges from $41,843.45 applicable to the year 1942, to $45,262.17 applicable to the year 1943. The petitioner contends that a fair and just amount representing normal earnings would be a constructive average base period net income of $80,000.

The president of the petitioner testified that the operations of the Pacific Northwest millers drastically reduced the petitioner's earnings during the base period years. He stated that the Pacific Northwest flour was offered to petitioner's regular customers at prices lower than those at which the petitioner could afford to sell flour, and that its customers bought such flour instead of buying from the petitioner. He stated that the petitioner reduced its margin of profit and also lost volume of business.

We have no doubt that the activity of the Pacific Northwest millers in the petitioner's territory did have an adverse effect upon the petitioner's business. In 1933 and 1934 the influx of Pacific Northwest flour began to assume large proportions. The peak was reduced in 1935, and the quantity of flour shipped into the southeastern area continued to be high in 1936 and 1937, after which it began to diminish and this competition substantially ceased by 1939 or 1940. However, the record contains no details as to any loss of customers or business. Nor from the record can it be determined just how much decrease in profit the petitioner sustained upon flour sales, since it did not keep records showing the cost of production of its individual products. It may have suffered some loss of profits on its other products. Furthermore, although the tonnage of flour produced and sold by the petitioner during the years 1936 through 1939 dropped to an annual average of 9,258 tons as compared to an annual average of 13,202

tons over the years 1929 to 1935, the evidence shows that for years after 1939 up to and including 1945, the average annual tonnage of flour produced and sold by the petitioner dropped to 7,046 tons.[2] Inasmuch as the competition of the Pacific Northwest mills had practically ceased by 1939 or 1940, it seems evident that some other factor, perhaps of a permanent nature such as, for example, a decline in the demand for family flour, was causing a progressive decline in the volume of flour produced and sold by the petitioner. See *Emporium World Millinery Co.*, 32 T.C. 292. Under these circumstances, we are unable to determine to what extent the petitioner's business was depressed in the base period due to the shipment of flour by the Pacific Northwest millers into the southeastern area. Nor can we conclude that any decrease in profits on flour during the base period was a temporary condition.

However, even if it were established that the reduction of petitioner's earnings in the base period was due to the shipment by the Pacific Northwest millers of flour into the southeastern area, we would still feel compelled to deny the petitioner the relief requested, since in our opinion this would not constitute a temporary economic circumstance unusual in the case of the petitioner, within the meaning of section 722(b)(2). We have heretofore, on numerous occasions, taken the position that competition, even keen competition, is not a ground for relief under section 722(b)(2), since competition is present in almost any business and, instead of being unusual, is quite common, and is the very essence of our capitalistic system. *Lamar Creamery Co.*, 8 T.C. 928; *Harlan Bourbon & Wine Co.*, 14 T.C. 97; *Winter Paper Stock Co.*, 14 T.C. 1312; *Constitution Publishing Co.*, 23 T.C. 19; and *Brown Paper Mill Co.*, 23 T.C. 47, appeal dismissed (C.A. 5) 255 F. 2d 77; *Ainsworth Manufacturing Corporation*, 23 T.C. 372; *Democrat Publishing Co.*, 26 T.C. 337; and *Seggerman Nixon Corporation*, 26 T.C. 442. The record establishes that the flour-milling industry, including the specific business of the petitioner, was competitive.

But, says the petitioner, this particular competition was unusual in its case, its customary competition being from local millers and to some extent large national mills. It is argued that the combination of cheap wheat in the Pacific Northwest, cheap water transportation rates from the west coast to the east coast, and the fact that the southeastern area was the best market for the Northwest millers, constituted a set of circumstances which was temporary and unusual. It is also argued that this competition was a temporary economic

---

[2] Reference to post-base-period years for the purpose of determining whether the petitioner qualifies for relief under section 722(b)(2) is not prohibited by the statute. *Del Mar Turf Club*, 16 T.C. 749; *Dyer Engineers, Inc.*, 10 T.C. 1265; and *East Texas Motor Freight Lines*, 7 T.C. 579.

circumstance for the reason that the underlying causes of the loss of the Orient trade by the Pacific Northwest were temporary in nature. Accordingly, the petitioner urges that this competition was not the normal activity of a competitor who enters a market with some feasible prospect and intention of continuing in that market.

The respondent's witness, an expert in the field of flour marketing, having been a grain economist with the Federal Farm Board from 1931 to 1933, and having thereafter been head of the grain marketing division of the Agricultural Adjustment Administration, testified at some length with respect to the economic situation prevailing at the times in question. He stated that there was normal competition in wheat and flour in the United States, that the Government policy was to not interfere with this competition and that it did not do so until 1938. At that time, he stated, an artificial situation was created by the Government in giving an advantage in prices to the Pacific Northwest through the making of Commodity Credit Corporation loans on wheat and that this ended for all practical purposes the volume shipment of wheat and flour from the west coast to the east coast, since the Commodity Credit Corporation obtained the bulk of the wheat. He in effect testified that until the Government took its action in 1938 the wheat and flour market in this country was free, open, and competitive, which was normal in our system and that the shipment to the southeastern area of flour milled in the States of Washington and Oregon was a normal operation in terms of economics. He further stated that these shipments to the east coast would at the time have been considered a permanent part of the competitive situation, there being no Government policy of intervention. In addition, he testified that export subsidies granted to the Pacific Northwest millers were effective in helping the Northwest millers regain their export market in the Orient.

Although the petitioner's customary competition had been from local mills and to some extent from large national mills, and this competition of the Pacific Northwest mills was in that sense unusual, nevertheless we do not think that within the meaning of the statute it should be considered as a temporary economic circumstance unusual in the case of the petitioner. We think it was normal competition in the economic sense. Although on brief the petitioner makes some reference to "dumping" of west coast flour in its area, there is no evidence to indicate that the Pacific Northwest millers entered this area without a profit motive or that they did in fact sell at a loss.

It seems clear that the reason for the cessation of this competition about 1939 was the action taken in late 1938 by the United States Government in making wheat loans to farmers in the Pacific Northwest and in providing export subsidies. This action of the Federal Government can only be considered as changing the existing normal

competitive market. It may be added that in our opinion such Government action was not foreseeable in view of the ineffective export subsidy program which had been tried in 1933 and 1934, and in view of the policy of the Agricultural Adjustment Administration at all times prior to 1938 of noninterference in the domestic flour market. The fact that the competition was actually temporary in point of time is not controlling. We have heretofore quoted with approval section 35.722–3(b) of Regulations 112, which states that "[a]n economic circumstance is temporary depending upon the character and nature of such circumstances rather than upon the mere length of time of its existence." See *Kentucky Whip & Collar Co.*, 19 T.C. 743, and *Constitution Publishing Co., supra.*

As indicated above, the petitioner urges that the competition was temporary for the reason that the loss by the Pacific Northwest millers of the export trade to the Orient was caused by temporary economic circumstances. However, we think the record would not sustain a conclusion that the loss of the export trade was due to inherently temporary factors.

Factors affecting such export of flour to the Orient included the competition of millers of Canada, Australia, and Argentina, who were able to undersell the Pacific Northwest millers; the Chinese-Japanese war; the depression in the Orient; and Japanese currency difficulties. From the record we cannot find the extent to which each factor contributed to the decline in exports. In testifying as to the factors affecting the loss by the Pacific Northwest millers of their export trade to the Orient, neither witness emphasized the depression in the Orient or the Japanese currency problems. One witness seemed to lay more stress upon the competition of the mills of Canada, Australia, and Argentina, although he did mention the Chinese-Japanese war as a factor. The other witness laid stress upon the Chinese-Japanese war. The foreign competition may well have been the principal factor in the loss of the export trade, since we note that the Pacific Northwest mills recouped their Orient trade in 1939 despite the fact that the war was still in progress. If indeed the principal cause was the foreign competition, we think the cause could not be said to have been a temporary economic circumstance.

The petitioner has cited in support of its claim for relief three prior cases decided by this Court: *Southern California Edison Co.*, 19 T.C. 935, *Ainsworth Manufacturing Corporation, supra,* and *Boonton Molding Co.*, 24 T.C. 1065. Upon analysis we find that none of those cases is applicable here. In each of them a depression of business was caused by some factor other than the normal economic factor of competition. In *Southern California Edison Co., supra,* the temporary depression in the taxpayer's business was due in the main to the loss of three principal customers for electric power, namely the

cities of Los Angeles, Glendale, and Burbank, as a result of the construction of Boulder Dam. The circumstances there presented were held to come within one of the examples set forth in section 35.722–3(b) of Regulations 112.[3] In *Ainsworth Manufacturing Corporation, supra,* the depression in business was caused by the fact that the taxpayer's principal customers, Ford and Chrysler, decided to discontinue to use the taxpayer's principal products, adjustable windshields and mechanical brakes. In *Boonton Molding Co., supra,* the decrease in earnings was the result of a change in policy of the taxpayer's sole distributor, causing a loss in the taxpayer's sales volume. Furthermore, in each of those cases the taxpayer recouped its lost business. In the instant case it has not been shown that the petitioner regained its lost flour business. Indeed, even after the cessation of the competition in 1939, its volume of sales of flour continued to decrease.

It is our conclusion that the petitioner has not shown that its business was depressed in the base period because of temporary economic circumtances unusual in its case, within the meaning of the statute, and hence has not shown that its average base period net income is an inadequate standard of normal earnings. It is, therefore, not entitled to relief from excess profits taxes for the years in question under section 722(b) (2) of the Code.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

[3] Such example is as follows:

"An example * * * might be a taxpayer which for a long period of years conducted business with one customer which it lost during the base period because such customer decided to manufacture for itself the product it had formerly bought from the taxpayer. The taxpayer would be compelled to develop a new market. The average earnings of the taxpayer for the period of time during which the taxpayer was engaged in obtaining new customers would not represent an adequate standard of its normal earnings and would be sufficient cause for the establishment of a constructive average base period net income under section 722."